**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES,<br><br>1101 Connecticut Avenue, NW<br>Suite 900<br>Washington, D.C. 20036,<br><br>    Plaintiff,<br><br><br>    v.<br><br><br><br>ARNE DUNCAN, in his official capacity as Secretary of the Department of Education,<br><br>Office of the Secretary<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202, and<br><br>THE DEPARTMENT OF EDUCATION,<br><br>400 Maryland Avenue, SW<br>Washington, D.C. 20202,<br><br>    Defendants. | Civil Action No. 14-277 |

**COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES ("APSCU" or "Plaintiff") for its complaint against Defendants, SECRETARY OF THE DEPARTMENT OF EDUCATION ARNE DUNCAN ("Secretary Duncan") and THE DEPARTMENT OF EDUCATION (the "Department") alleges, by and through its attorneys, on knowledge as to Plaintiff, and on information and belief as to all other matters, as follows:

## **Preliminary Statement**

1.      This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706 ("APA"), challenging certain regulations that govern how postsecondary educational institutions compensate employees engaged in or with responsibility for recruiting, admissions, and financial aid.  These regulations are known as the Compensation regulations.  The Department originally adopted the Compensation regulations on October 29, 2010, *see* 75 Fed. Reg. 66,832 (Oct. 29, 2010) ("2010 Final Rule"), under Title IV of the Higher Education Act of 1965 ("HEA"), as amended, 20 U.S.C. § 1070 *et seq*. ("Title IV").  The Department reissued the Compensation regulations in a purportedly "amended" form on March 22, 2013, *see* 78 Fed. Reg. 17,598, 17,599-600 (Mar. 22, 2013) ("2013 Amended Preamble"), in response to an opinion of the United States Court of Appeals for the District of Columbia Circuit and a remand order by the District Court, *APSCU v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012); Order, *APSCU v. Duncan*, No. 11-0138 (D.D.C. Aug. 14, 2012) (D.E. 35) ("Remand Order").  Notwithstanding the 2013 Amended Preamble, the Compensation regulations continue to violate the APA because their prohibitions on compensation based on retention, graduation, job placement, and racial diversity are not supported by evidence or any reasoned explanation.[1]

2.      Plaintiff APSCU is a trade association whose members are private sector colleges and universities that educate both traditional and nontraditional students—such as working adults and single parents—who are underserved by conventional public and non-profit institutions of higher education.  APSCU's member schools annually educate millions of students, helping them learn the skills necessary to become productive members of the nation's workforce.

---

[1]  This complaint refers to these forms of compensation as "graduation-based" and "diversity-based."

3.      The Compensation regulations undermine the ability of all postsecondary educational institutions—including public and non-profit schools—to pay their employees merit-based compensation both for helping students to persevere in their studies to graduation and to secure employment thereafter, which are core goals of Title IV programs, and for assembling a racially diverse student body, which has long been a priority for the Department.

4.      The Department has now twice failed to justify the Compensation regulations' prohibitions on graduation- and diversity-based compensation:  neither the 2010 Final Rule nor the 2013 Amended Preamble provides any evidence or rational justification for prohibiting such compensation.

5.      The Compensation regulations negatively affect the students served by APSCU's members.  As recognized by the Department, APSCU's member institutions are a crucial component of the country's system of higher education and have "pioneered new approaches to enrolling, teaching, and graduating students."  75 Fed. Reg. 43,616, 43,617 (July 26, 2010).  Low-income, minority, and first-generation college attendees, as well as other traditionally underserved student populations such as working adults and single parents, benefit most from programs offered by private sector colleges and universities.  The student populations at such schools are largely made up of people who live independently without parental support, are over 24 years old, are first-generation college attendees, have children (and are often single parents), or are racial minorities.  Yet, the Compensation regulations threaten private sector schools' ability to offer their highly effective services to these students by prohibiting them from rewarding employees for recruiting and admitting students who demonstrate an ability to benefit from their programs and for assembling a racially diverse student body.

6.     Graduation- and diversity-based compensation aligns the interests of recruiters and students by promoting the recruitment of students likely to benefit from the educational programs being offered.  By prohibiting such compensation, the Department's regulations reduce the opportunity for students to benefit from the "pioneer[ing] new [educational] approaches" offered by private sector colleges and universities that can help them achieve their employment goals in an increasingly competitive and skills-driven labor market.  This places the regulations directly at odds with President Obama's goal of "leading the world in the percentage of college graduates by 2020," a goal the Department has recognized as being impossible to achieve "without a healthy and productive higher education for-profit sector."  75 Fed. Reg. at 43,617.

7.     Despite having had multiple opportunities to do so, the Department simply cannot justify its prohibition on graduation- and diversity-based compensation.  Those restrictions violate the APA and therefore should be vacated.

## I.  PARTIES

8.     Plaintiff APSCU is an association of the private sector education industry, incorporated under the provisions of the District of Columbia Non-Profit Corporation Act, D.C. Code Ann. §§ 29-301.01-.114, with its principal place of business located at 1101 Connecticut Avenue, NW, Suite 900, Washington, D.C. 20036.  APSCU represents more than 1,500 private sector schools that annually provide educational opportunities for millions of students for employment in hundreds of occupational fields.  APSCU's members qualify as "institution[s] of higher learning" under the HEA and are eligible to participate in Title IV student aid programs.  20 U.S.C. § 1002.  Many of APSCU's member schools became subject to the Department's regulations on their effective date, July 1, 2011, or at some point thereafter.  Those members have already taken steps to bring their operations into compliance with the Compensation regulations.  The interests APSCU seeks to protect in filing this lawsuit are germane to the

organization's mission to promote access to career education and to emphasize the importance of workforce development.  Neither the claims asserted nor the relief requested in this lawsuit requires the participation of individual APSCU members.

9.      Defendant Arne Duncan is the Secretary of the Department of Education.  His official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.  He is being sued in his official capacity.  In that capacity, Secretary Duncan has overall responsibility for the operation and management of the Department.  Secretary Duncan, in his official capacity, is thus responsible for the Department's unlawful promulgation of the final Compensation regulations and for related acts and omissions alleged herein.

10.     Defendant Department of Education is, and was at all times relevant hereto, an executive agency of the United States Government subject to the APA.  *See* 5 U.S.C. § 551(1). The Department, in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668 (1979).  The Department is located at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## II. JURISDICTION AND VENUE

11.     This action arises under the APA.  5 U.S.C. §§ 553, 701-06.  Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Venue is proper in this Court under 28 U.S.C. § 1391(e)(1), (2), and (3) because this is an action against officers and agencies of the United States, Defendant Department of Education resides in this judicial district, Defendant Secretary Duncan performs his official duties in this judicial district, a substantial part of the events or omissions giving rise to this action occurred in this judicial district, Plaintiff resides in this judicial district, and no real property is involved in the action.

### III.  FACTUAL ALLEGATIONS

**A.    BACKGROUND.**

12.    The Department oversees the administration of Title IV funds.  The Department carries out this role by subjecting all schools that accept students who pay for their education with Title IV funds—public, non-profit, and private alike—to stringent regulatory requirements. Title IV programs—and the Department's implementation of them—are meant to foster Americans' access to higher education and the possibility of professional advancement.

13.    Private sector education plays an important role in producing a better educated and more skilled population necessary for the United States to thrive in a globalized economy. In fact, the Department recognized in the 2010 Final Rule that the private sector "has long played an important role in the nation's system of postsecondary education."  75 Fed. Reg. 66,665, 66,671 (Oct. 29, 2010) (codified at 34 C.F.R. pt. 600).  Private sector education expanded primarily to fill the educational needs of nontraditional students—low-income, minority, first-generation, working-adult, and single-parent students—that traditional schools have been unable to meet.

14.    Private sector schools have the required infrastructure in place—both on the ground and online—to cater to nontraditional students.  And each year, hundreds of thousands of prospective students vote with their feet and choose to enroll in programs offered by private sector schools.  They do so to prepare for and advance their careers and to improve their quality of life and that of their families.  Although reasons for their choices vary, students are often attracted by private sector schools' flexible, innovative, and hands-on programs as well as their demonstrated commitment to graduation and career placement.

15.    Private sector schools have consistently delivered quality education to those students who choose to enroll in their programs.  A substantial percentage of the technically

trained workers who enter the American workforce each year are educated at private sector

schools.  Private sector schools also meet increased demand for retraining displaced workers and

upgrading skills for a wide variety of public and private employers.  Notably, graduation rates

are substantially higher at two-year private sector schools than at two-year public sector schools

even though, compared to their public and non-profit sector counterparts, private sector schools'

student populations are weighted more heavily toward nontraditional students who are,

historically, less likely to graduate than traditional students.

16.     Private sector schools are indispensible to meeting the goal, endorsed by President

Obama, that the United States have the highest proportion of college graduates in the world by

2020.  *See* 75 Fed. Reg. at 43,617.  Achieving that goal will require millions of new students—

including nontraditional students—to graduate from college over the next six years.  Without

private sector schools—which are increasing their capacity at higher rates than their public sector

counterparts—to help meet rising demand, it would be exceedingly difficult, and perhaps

impossible, to meet that goal.  Indeed, private sector schools, using far fewer taxpayer dollars

than their public and non-profit counterparts, are investing their own funds to contribute to the

necessary expansion of the nation's postsecondary educational opportunities.

17.     The Federal Government, states, and private accreditation bodies closely regulate

all schools, including private sector schools.

18.     The Department's Compensation regulations impose significant regulatory

obstacles to private sector schools' ability to participate in Title IV programs.  Specifically, the

Department's prohibition on graduation- and diversity-based compensation for recruiting,

admissions, and financial aid personnel will make it more difficult for schools to fulfill the aims

of Title IV financial aid programs, which include the recruitment of qualified students and the

enrollment of racially diverse student bodies.

**B.     THE RULEMAKING PROCESS AND THE DEPARTMENT'S FAILURE TO
        RESPOND TO THE DISTRICT COURT'S REMAND ORDER.**

19.     In 1992, Congress amended the HEA to prohibit educational institutions that

wished to participate in Title IV programs from providing "any commission, bonus, or other

incentive payment based directly or indirectly on success in securing enrollments or financial aid

to any persons or entities engaged in any student recruiting or admission activities or in making

decisions regarding the award of student financial assistance."  20 U.S.C. § 1094(a)(20).

20.     The Department's initial implementation of this statutory provision caused

considerable confusion among schools of all types about which kinds of compensation were

permitted and which were prohibited.

21.     During the 1990s, the Department provided informal letter guidance on these

points, which, while sometimes useful, was often contradictory.  For example, most of the

Department's guidance stated that payment of merit-based *salaries* was permissible but did not

consistently explain the extent to which non-enrollment factors had to be considered in order for

merit-based salaries to be acceptable to the Department.  In addition, the Department at times

stated that salaries paid to recruiters were permissible provided they were only adjusted once per

year; at other times the Department stated that adjustments twice per year were acceptable.

22.     In 2002, the Department acknowledged its deficiencies in implementing the

statutory compensation prohibition, admitting that its informal approach had proved

"problematic" and had resulted in "unclear guidance" to schools.  Plaintiff's Motion for

Summary Judgment, *APSCU v. Duncan*, No. 11-0138 (Feb. 25, 2011) (D.E. 15-2, Ex. D (Letter

from Jeffrey R. Andrade, Dep't of Educ., to Leigh M. Manasevit and Jonathan D. Tarnow,

Brustein and Manasevit (Dec. 4, 2002))).  Accordingly, the Department recognized that more uniform standards were necessary to allow educational institutions to carry out their missions effectively.  *Id.*  To that end, the Department conducted negotiated rulemaking sessions that resulted in the adoption of a series of interrelated regulations (the "Clarifying regulations").  *See* 67 Fed. Reg. 67,048, 67,049 (Nov. 1, 2002) (noting that the regulations "clarify the statutory program participation agreement provision concerning incentive payment restrictions").

23.     The Clarifying regulations outlined twelve non-exhaustive types of payment arrangements that had never violated, and would not in the future be considered to violate, the HEA.  *See* 34 C.F.R. § 668.14(b)(22)(ii)(A)-(L) (2002).  Among other things, the Clarifying regulations specified that compensation based upon students' successful completion of their programs of study was permissible.  *Id.* § 668.14(b)(22)(ii)(E).

24.     The Clarifying regulations allowed schools to provide competitive compensation to attract qualified and professional recruiting, admissions, and financial aid staffs without fear of being credibly accused of violating the HEA's compensation restriction.  Employing a professional and motivated workforce, in turn, enabled schools to provide prospective students with accurate and useful information to use in making decisions about their educational goals.

25.     On June 18, 2010, ignoring the clear history of regulatory confusion and the regulatory guidance provided by the Clarifying regulations, the Department issued a Notice of Proposed Rulemaking, which gave notice of the Department's intention to repeal the Clarifying regulations.  *See* 75 Fed. Reg. at 34,817-18 ("2010 Proposed Rule").  Of particular relevance here, the Department proposed to prohibit graduation-based compensation for recruiting, admissions, and financial aid personnel.

26.     The Department received numerous comments in response to the 2010 Proposed Rule.  Among other things, commenters objected to the 2010 Proposed Rule's prohibition on graduation-based compensation on several grounds, including that the Department had failed to provide a reasoned justification for the prohibition.

27.     On October 29, 2010, the Department adopted the Compensation regulations. The 2010 Final Rule mirrored the 2010 Proposed Rule, with minimal changes, and repealed the Clarifying regulations.  *See* 75 Fed. Reg. at 66,874.  Among other things, the Compensation regulations expressly prohibit graduation-based compensation.  *Id*.

28.     Similar to the 2010 Proposed Rule, the 2010 Final Rule attempted to justify the prohibition on graduation-based compensation on several grounds.  For example, the Department alleged that the HEA required it to prohibit such compensation because it is based "indirectly on success in securing enrollments"; according to the Department, that is so because students cannot graduate unless they first enroll.  75 Fed. Reg. at 66,874; 75 Fed. Reg. at 34,818.  The Department also argued that graduation-based compensation should be prohibited because "an institution's resolute and ongoing goal should be for its students to complete their educational programs," and "[e]mployees should not be rewarded . . . for their contributions to this fundamental duty."  75 Fed. Reg. at 66,874.  In addition, the Department concluded that graduation-based compensation is "not necessary for institutions to appreciate the value of keeping students in school," and does not "enhanc[e] the quality of a student's educational experience."  *Id*.  Finally, to justify its prohibition on placement-based compensation in particular, the Department referred generally to "abuses [it] ha[d] seen," including a single instance in which a recruiter allegedly received a bonus for recruiting a culinary arts student who graduated and secured employment as an entry-level employee in the fast-food industry.  *Id*.

29.     In response to commenters' contention that the prohibition on graduation-based compensation would undermine the Administration's goal of increasing graduation rates and eliminate an important mechanism by which schools ensure that recruiters focus on the most qualified students, the Department repeated the view it had expressed in the 2010 Proposed Rule that "[i]nstitutions should not need" such compensation "to demonstrate their commitment to retaining students."  75 Fed. Reg. at 66,874.  The Department further insisted that an alleged "proliferation of short-term, accelerated programs, and the potential for shorter and shorter programs," increased the likelihood that graduation-based compensation would "be readily exploited."  *Id.*

30.     With respect to diversity-based compensation, the 2010 Final Rule failed to respond to commenters' concerns about the Compensation regulations' impact on "schools' ability to compensate their staffs for successfully managing outreach programs for students from disadvantaged backgrounds."  *APSCU*, 681 F.3d at 448 (quoting Letter from DeVry, Inc. to Jessica Finkel (Aug. 1, 2010)).  In addition, the Department did not explain how the regulations would apply to personnel in diversity offices, "who are involved in recruiting certain types of students."  *Id.* (quoting Letter from Career Educ. Corp. to Jessica Finkel (Aug. 1, 2010)).

31.     APSCU filed suit against the Department in the District Court for the District of Columbia on January 21, 2011, on the ground that the Compensation regulations violated the HEA and the APA.  *APSCU v. Duncan*, No. 11-0138 (D.D.C.).[2]

---

[2]  APSCU challenged three sets of regulations affecting schools' eligibility to receive Title IV financial aid: the Compensation regulations, 34 C.F.R. § 668.14 (75 Fed. Reg. at 66,950-51); the Misrepresentation regulations, 34 C.F.R. § 668.71 (75 Fed. Reg. at 66,958-59); and the State Authorization regulations, 34 C.F.R. § 600.9 (75 Fed. Reg. at 66,946-47).  Only the Compensation regulations are at issue here.

32.     Following cross-motions for summary judgment, the District Court concluded (as relevant here) that the Compensation regulations reflected a permissible interpretation of the HEA and that the Department had "provided an adequate response to the relevant and significant comments." *Id.* (D.E. 28, at 18 n.7).

33.     APSCU appealed to the Court of Appeals for the District of Columbia Circuit. On June 5, 2012, that Court affirmed in part and reversed in part, holding that the Compensation regulations violated the APA, 5 U.S.C. § 706, in two respects.  First, the Court held that the decision to prohibit compensation "based upon students successfully completing their educational programs or one academic year of their educational program" was "arbitrary and capricious without some better explanation." *APSCU*, 681 F.3d at 448 (internal quotation marks omitted).  As the Court emphasized, compensation based on retention and graduation "seems perfectly in keeping with" the goals of the HEA.  *Id.*  The Court admonished the Department for justifying the prohibition on graduation-based compensation with a "fleeting reference to 'short-term, accelerated programs'" and "isolated examples of students who graduated from schools but could not find commensurate work."  *Id.* (quoting 75 Fed. Reg. at 66,874).  The Court held these rationales "insufficient" to satisfy the Department's obligations under the APA.  *Id.*  The Court further faulted the Department for failing to point to anything "in the record supporting [its] assertions."  *Id.*

34.     Second, the Court held that the "Department failed to address [commenters'] concern . . . that the Compensation Regulations could have an adverse effect on minority enrollment," including by foreclosing schools' ability to compensate their employees for successfully assembling a racially diverse student body or for successfully managing outreach programs for diverse students.  *Id.*  As the Court explained, the Department's "failure to address

these [concerns]" was "fatal to its defense" of the Compensation regulations.  *Id*. at 449 (internal quotation marks omitted).

35.     As a result of these failings, the Court of Appeals remanded the case to the District Court "with instructions to remand the challenged regulations to the Department for reconsideration consistent with [its] opinion."  *Id*. at 463.  On August 14, 2012, the District Court remanded to the Department for action consistent with the D.C. Circuit's opinion.  *See* Remand Order.

36.     Seven months after the District Court's Remand Order, without soliciting public comment or supplementing the record, the Department published the 2013 Amended Preamble, leaving the text of the regulations unchanged.  78 Fed. Reg. at 17,599-600.

37.     At a minimum, the remand required the Department to supply a reasoned justification, supported by citations to the administrative record, for prohibiting graduation-based compensation and to respond to commenters' concerns regarding the Compensation regulations' effect on schools' ability to assemble a diverse student body.  The 2013 Amended Preamble does neither.

**C.     THE DEPARTMENT'S EXPLANATION FOR PROHIBITING GRADUATION-BASED COMPENSATION RECITES RATIONALES THAT WERE REJECTED BY THE COURT OF APPEALS AND IS UNREASONED.**

38.     The Department's 2013 Amended Preamble recycles many of the same perfunctory and unreasoned explanations that the Court of Appeals rejected in its prior decision.

39.     For example, the Department repeats its "belie[f]" that educational employees "should not be rewarded beyond their standard salary or wages" when recruited students successfully complete their educational programs, and that graduation-based compensation does not benefit students.  78 Fed. Reg. at 17,599.  This argument was rejected by the Court of

Appeals, which observed that graduation-based compensation "seems perfectly in keeping with" the HEA's goals. *APSCU*, 681 F.3d at 448.

40.     The Department restates its view that the HEA requires it to ban graduation-based compensation because enrollment is a condition of graduation, and therefore graduation-based compensation is "indirectly" related to enrollment. 78 Fed. Reg. at 17,599. The D.C. Circuit necessarily rejected this argument.

41.     The 2013 Amended Preamble reports that the Department continues to "disagree" with the view that prohibiting graduation-based compensation "is inconsistent with the Administration's goal of increasing student retention," because "[i]nstitutions should not need [it] to demonstrate their commitment to retaining students." 78 Fed. Reg. at 17,599. But the Department nowhere explains where it derives the authority to prohibit any compensation practice it deems "unnecessary."

42.     The 2013 Amended Preamble recites the same parade of horribles that the Department invoked to justify the 2010 Proposed Rule, including fears that graduation-based compensation will somehow encourage "misrepresented program offerings, lowered academic progress standards, altered attendance records, and a lack of meaningful emphasis on retention." 78 Fed. Reg. at 17,599; *see also* 75 Fed. Reg. at 34,817-18. The D.C. Circuit has already deemed these re-run rationales to be insufficient. And the Department cites no evidence to support its fears; nor does it explain how prohibiting graduation-based compensation could improve academic performance or program quality.

43.     The 2013 Amended Preamble also attempts to justify the Department's prohibition on graduation-based compensation on the ground that recruiters' "primary function" is to "serve as [student] counselors" who should not "pressure students to remain enrolled even

when [they] are dissatisfied with [their] program [of study]." 78 Fed. Reg. at 17,599; *see also* 75 Fed. Reg. at 66,872. These rationales lack any factual foundation. Further, the 2013 Amended Preamble ignores that students often benefit from encouragement to stay in school. In any event, the Department fundamentally misconstrues recruiters' primary function, which the Department has acknowledged elsewhere is to recruit. *See* 75 Fed. Reg. at 34,818. Rather, the Department bizarrely contends—without citing any statute or regulation that authorizes it to define recruiters' job responsibilities—that good recruiting could consist *entirely* of convincing unqualified students not to enroll in a particular program. 78 Fed. Reg. at 17,599.

44. The 2013 Amended Preamble repeats a solitary anecdote from the 2010 Final Rule about a recruiter who was allegedly rewarded for recruiting a student who graduated from a culinary arts program and secured a job at a fast-food restaurant. 78 Fed. Reg. at 17,599; *see also* 75 Fed. Reg. at 66,874. The D.C. Circuit specifically held that this anecdote was "insufficient" as a matter of law to sustain the prohibition on graduation-based compensation. *APSCU*, 681 F.3d at 448. This lone anecdote is the Department's sole justification for prohibiting placement-based compensation.

45. As in the 2010 Proposed and Final Rules, the 2013 Amended Preamble again insists that prohibiting graduation-based compensation is justified because of an alleged proliferation of "short-term, accelerated programs," which increases the potential for schools to compensate employees based on completion. 78 Fed. Reg. at 17,599; 75 Fed. Reg. at 66,874; 75 Fed. Reg. at 34,818. But the D.C. Circuit rejected this rationale as both "insufficient" and lacking evidentiary support. *APSCU*, 681 F.3d at 448.

46. The 2013 Amended Preamble nowhere substantiates the Department's claim that there has been a proliferation of short-term programs. And even assuming such a proliferation,

the 2013 Amended Preamble does not explain why it would justify prohibiting graduation-based compensation. The Department does not, for example, explain why short-term programs are problematic.

47. The 2013 Amended Preamble seeks to paper over its shortcomings, alleging that "comments [the Department] received during and following the November 2009 Negotiated Rulemaking Meeting" show a "potential" for schools to abuse short term-programs. 78 Fed. Reg. at 17,599. But the 2013 Amended Preamble does not identify any such comments and therefore fails to satisfy the D.C. Circuit's demand for concrete evidentiary support, particularly since all comments were part of the administrative record before the Court when it held that the Department had violated the APA by failing to provide a reasoned justification for prohibiting graduation-based compensation.

48. Moreover, the only purported "abuse" the Department identifies related to short-term programs as a justification for prohibiting graduation-based compensation is that students are more likely to graduate from them. 78 Fed. Reg. at 17,599. But graduation is a good thing, as the Department has previously recognized in explaining that "[g]raduation from . . . eligible programs is what the taxpayer is paying for with . . . student aid programs." Plaintiff's Motion for Summary Judgment, *APSCU v. Duncan*, No. 11-0138 (Feb. 25, 2011) (D.E. 15-2, Ex. E) (Letter from the Department of Education responding to inquiries regarding the scope of the HEA's compensation restrictions).

49. The 2013 Amended Preamble does not identify any evidence of "abuse" associated with longer programs that could justify prohibiting graduation-based compensation with respect to such programs. Nor does the 2013 Amended Preamble explain why "abuses"

with respect to *short-term* programs could possibly justify prohibiting graduation-based compensation with respect to longer programs.

50.     The 2013 Amended Preamble alleges that graduation-based compensation "reward[s] enrollment and completion notwithstanding the student's academic performance or the quality of the program." 78 Fed. Reg. at 17,599.  This assertion is both misleading and legally disconnected from the HEA.  First, the Department has acknowledged that graduation is proof that an enrolled "student was qualified to attend the institution." 67 Fed. Reg. at 67,056. Moreover, the presumption must be that every program covered by the regulations is of acceptable quality because all schools subject to the regulations are accredited, state authorized, and meet the Department's standards for being eligible to participate in Title IV programs. Second, the Department does not explain how restrictions on graduation-based compensation could result in improved academic performance or program quality.  In any event, such concerns cannot justify the prohibition on graduation-based compensation because, in the Department's own words, "the purpose of the incentive compensation prohibition is to prevent institutions from enrolling *unqualified students*" and that "other legislative and regulatory requirements are designed to weed out institutions with poor quality programs." *Id.* (emphasis added); *see also United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1168-69 (9th Cir. 2006).

51.     The 2013 Amended Preamble offers nothing new in response to the D.C. Circuit's suggestion that the Department might justify the prohibition on graduation-based payments based on a "belief that institutions have used graduation rates as a proxy for recruitment numbers." *APSCU*, 681 F.3d at 448.  In apparent response to that invitation, the 2013 Amended Preamble states that "the Department's experience [has been] that institutions use [graduation-

based compensation] to provide recruiters with compensation that is 'indirectly' based upon securing enrollments." 78 Fed. Reg. at 17,599.  But the Department admits that it has already made that argument in the 2010 Proposed Rule, *id*., and thus its "experience" in this regard has already been judged to be insufficient to satisfy the APA.  *See APSCU*, 681 F.3d at 448.  Further, the 2013 Amended Preamble does not identify any relationship between graduation-based compensation and enrollment-based compensation or otherwise explain how schools could use graduation-based compensation as a pretext for enrollment-based compensation.

52.      The 2013 Amended Preamble also contends that recruiters at schools with completion rates of "approximately 10 to 25 percent," will seek to "enroll even more marginal students, and make even greater unfounded claims about a program, to increase the potential that some will actually complete their program of study."  78 Fed. Reg. at 17,599.  This alleged risk is wholly unsubstantiated.  Without any evidence, there is no reason to believe that recruiters will respond to graduation-based compensation by enrolling "even more marginal students" rather than using their finite time to target students who are most likely to graduate.  Even setting aside that problem, by its terms this rationale would only justify prohibiting graduation-based compensation at schools with graduation rates between 10 and 25 percent.  Finally, any link between graduation-based compensation and misrepresentations is separately addressed by the HEA's prohibition on misleading statements.  *See* 34 C.F.R. § 668.71.

53.      Ultimately, the 2013 Amended Preamble fails to provide a reasoned explanation for prohibiting graduation-based compensation.  The Department's explanations for the prohibition defy logic, history, and all available evidence.  The prohibition is thus unlawful under the APA.

**D.      THE DEPARTMENT'S EXPLANATION FOR PROHIBITING DIVERSITY-BASED COMPENSATION RECITES RATIONALES THAT WERE REJECTED BY THE COURT OF APPEALS AND IS UNREASONED.**

54.      The Department's prohibition on compensation for the successful assembly of diverse student bodies eliminates incentives for recruiters to focus on assembling diverse student bodies and therefore undermines the Department's longstanding diversity priorities.

55.      Private sector education expanded primarily to fulfill the educational needs of nontraditional students—low-income, minority, first-generation, working adult, and single-parent students—that traditional schools were unable or unwilling to meet.  And the Department has long supported diversity in postsecondary education.

56.      As it did with respect to graduation-based compensation, the Department insists that the HEA requires it to prohibit "all compensation to persons and entities that directly or indirectly provide an incentive to encourage enrollment" and that the Compensation regulations therefore do not "distinguish between incentives for personnel or staff recruitment actions that could have certain effects," including impairing the recruitment of racially diverse student bodies.  78 Fed. Reg. at 17,600.  The D.C. Circuit, however, necessarily rejected that justification as nonresponsive and arbitrary and capricious.  *See APSCU*, 681 F.3d at 448-49.

57.      The Department's insistence that the HEA requires it to prohibit all enrollment-based compensation, including diversity-based compensation, is also belied by its express approval of bonuses to coaches who are tied explicitly to the recruitment (and therefore the enrollment) of athletes who, for example, contribute to a successful athletic season or a team's overall academic performance.  75 Fed. Reg. at 66,874-75.

58.      The Department insists that prohibiting diversity-based compensation will protect "students of all races and backgrounds from being urged or cajoled into enrolling in a program that will not best meet their needs."  78 Fed. Reg. at 17,600.  But the Department does not

identify any record evidence supporting such abuse of "all" students that could justify abandoning its longstanding diversity priorities.

59.     The Department also contends that diversity-based compensation must be prohibited because "[m]inority and low income students are often the targeted audience of recruitment abuses" and its regulations are "intended to end that abuse."  78 Fed. Reg. at 17,600. But the Department does not identify any such abuses, explain why minority and low-income students are particularly susceptible to them, or detail how prohibiting diversity-based compensation will address them.

60.     Finally, the Department contends that the prohibition on diversity-based compensation does not actually reflect a change because "there never was a safe harbor addressing minority recruitment" and "neither the prior regulations nor these regulations provided a change in this area."  78 Fed. Reg. at 17,600.  That is false.  Under the 2002 Clarifying regulations, schools were permitted to structure compensation for covered employees to include biannual, merit-based salary adjustments for various reasons, and thus could compensate recruiters for success in assembling a diverse student body.  *See* 67 Fed. Reg. at 67,053; *see also* 34 C.F.R. § 668.14(b)(22)(ii)(A).

## IV.  CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF – VIOLATION OF THE APA: THE PROHIBITION ON GRADUATION-BASED COMPENSATION IS ARBITRARY AND CAPRICIOUS.

61.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

62.     The 2013 Amended Preamble does not comply with the District Court's Remand Order and is arbitrary and capricious.  Plaintiff is therefore entitled to have the regulations vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

63.     The Department has repeatedly failed to justify its ban on graduation-based

compensation.  The 2013 Amended Preamble demonstrates that the Department has decided to prohibit such compensation based entirely on its belief that such compensation is inappropriate because "institutions have sufficient reasons to value student retention and completion without providing incentives to recruiters."  78 Fed. Reg. at 17,599.  That is arbitrary and capricious.  If the Department wishes to prohibit conduct that the D.C. Circuit and commenters agree serves Title IV's interest in promoting the recruitment of qualified students, *APSCU*, 681 F.3d at 448, it must do more than baldly insist that institutions have "other" reasons to value student retention and completion.  It must identify concrete harms, supported by evidence, that support the elimination of the pre-existing compensation regime.  The Department has failed to satisfy that obligation.

64.     The Department's failure to provide evidence or reasoned explanations in support of its prohibition on graduation-based compensation violates the D.C. Circuit's instructions, the District Court's Remand Order, and basic tenets of administrative decision-making.  That the Department has now twice failed to justify its actions and has flouted the D.C. Circuit and the District Court demonstrates that it has no reasoned defense of its prohibition on graduation-based compensation.

65.     The prohibition on graduation-based compensation is arbitrary and capricious because the Department lacks any reasoned basis for its adoption, and it is unsupported by empirical evidence.

### SECOND CLAIM FOR RELIEF – VIOLATION OF THE APA: THE PROHIBITION ON DIVERSITY-BASED COMPENSATION IS ARBITRARY AND CAPRICIOUS.

66.     The Department fails to provide a meaningful and reasoned response to commenters' concerns that a ban on diversity-based compensation will harm diversity initiatives otherwise supported by the Department.  *See APSCU*, 681 F.3d at 449.  The Department's

purported response to commenters' concerns regarding the effect of the Compensation regulations on schools' ability to promote the assembly of diverse student bodies rehashes the same arguments that the D.C. Circuit rejected when it declared the Department's prohibition on graduation-based payments to be arbitrary and capricious.  *Id.* at 448-49.

67.     The Department's ban on diversity-based compensation is arbitrary and capricious because it departs from longstanding Department priorities without reasoned explanation, fails to consider adequately commenters' concerns about schools' ability to use compensation to promote the assembly of racially diverse student bodies, and is unsupported by evidence.

## V.  PRAYER FOR RELIEF

68.     WHEREFORE, Plaintiff prays for an order and judgment:

a.      Declaring that the Department's bans on graduation- and diversity-based compensation are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

b.      Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the prohibitions on graduation- and diversity-based compensation;

c.      Vacating the bans on graduation- and diversity-based compensation;

d.      Reinstating the Clarifying regulations' express approval of graduation-based compensation, *see* 34 C.F.R. § 668.14(b)(22)(ii)(E) (2010);

e.      Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,


Dated:  February 21, 2014                    /s/ Douglass R. Cox
                                             DOUGLAS R. COX, SBN 459668
                                             DCox@gibsondunn.com
                                             NIKESH JINDAL, SBN 200259
                                             NJindal@gibsondunn.com
                                             DEREK LYONS, SBN 995720
                                             DLyons@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             1050 Connecticut Avenue, NW
                                             Washington, District of Columbia 20036
                                             Telephone: 202.955.8500
                                             Facsimile: 202.467.0539

                                             TIMOTHY J. HATCH, SBN 374694
                                             THatch@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             333 South Grand Avenue
                                             Los Angeles, California 90071-3197
                                             Telephone: 213.229.7500
                                             Facsimile: 213.229.7520