UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                                    )
ASSOCIATION OF PRIVATE SECTOR                    )
COLLEGES AND UNIVERSITIES,                           )
                                                                    )
              Plaintiff,                                             )
                                                                    )
       v.                                                            )          Civil Action No. 14-277 (RMC)
                                                                    )
ARNE DUNCAN, Secretary,                                 )
U.S. Department of Education, *et al.*,                    )
                                                                    )
              Defendants.                                        )
                                                                    )
_____)

## OPINION

The D.C. Circuit remanded this matter to allow the Department of Education to provide a reasoned explanation for two aspects of new rules that affect for-profit colleges and universities. On remand, the Department supplemented the preamble to its regulations to comply with the D.C. Circuit's directives. The Association of Private Sector Colleges and Universities now complains that the Department has once again failed to support its regulations with record evidence and substantiated assertions. The Department of Education responds that its supplemented preamble satisfies the Circuit's limited remand. Both parties move for summary judgment. For the reasons set forth below, the Court will grant Plaintiff's motion.

## I.  FACTS

### A.  The Compensation Regulations

Every year, Congress provides more than $150 billion in federal grants and loans to institutions that enroll students in qualified educational programs. The Department of Education (Department) administers these programs, which were established under Title IV of

the Higher Education Act (HEA), Pub. L. No. 89–329, 79 Stat. 1219, 1232–54 (1965). The HEA

seeks to ensure that postsecondary institutions prepare students for graduation and employment,

and thereby increase the likelihood of student loan repayment. Thus, to participate in Title IV

programs, a postsecondary institution must satisfy several requirements to ensure that it meets

minimum quality standards before receiving federal funds. *See* 20 U.S.C. § 1094(a)

(establishing eligibility requirements for the receipt of Title IV funding).

However, the Department believes that some institutions have evaded these

statutory requirements to secure funding irrespective of program quality. In particular, private-

sector colleges and universities have come under fire for questionable recruiting tactics that have

led to the enrollment of underqualified students who fail to secure adequate employment and are

therefore at heightened risk for student loan default. The Department seeks to curb these

practices by, among other things, eliminating certain forms of incentive-based compensation for

recruiting personnel.[1]

In 2009, the Department concluded that its existing compensation regulations

were susceptible to manipulation. Of relevance here, the Department amended its regulations

covering incentive-based compensation (Compensation Regulations) to eliminate safe harbors

which had allowed postsecondary institutions to circumvent the statutory ban on certain

incentive payments. *See Ass'n of Private Sector Colls. & Univs. v. Duncan (APSCU)*, 681 F.3d

427, 434 (D.C. Cir. 2012) (citing 34 C.F.R. § 668.14(b)(22)).

---

[1] The HEA proscribes the payment of "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance . . . ." 20 U.S.C. § 1094(a)(20). For ease of reference, this Opinion references all such personnel as "recruiting personnel."

Specifically, the Department amended its Compensation Regulations to prohibit institutions receiving federal monies from offering "any sum of money or something of value, other than a fixed salary or wages," 34 C.F.R. § 668.14(b)(22)(iii)(A) (2011), "based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid," *id.* § 668.14(b)(22)(i).  Under the new rule, a postsecondary institution could award merit-based salary adjustments to its recruiting personnel, but only if the adjustments were not based "in any part, directly or indirectly," on a recruiter's success in securing enrollments.  *See id.*  In addition, the Compensation Regulations eliminated a safe harbor that had allowed schools to provide incentive compensation "based upon students successfully completing their educational programs or one academic year of their educational programs, whichever is shorter."  *Id.* § 668.14(b)(22)(ii)(E).  The new rule therefore proscribed all forms of graduation-based compensation for recruiting personnel.  Finally, the Department eliminated a safe harbor that had allowed schools to provide incentive-based compensation to "managerial or supervisory employees who do not directly manage or supervise employees who are directly involved in recruiting or admission activities, or the awarding of [T]itle IV, HEA program funds."  *Id.* § 668.14(b)(22)(ii)(G).

## B.  Prior Litigation

The Association of Private Sector Colleges and Universities (APSCU) is an association that represents over 1,500 private-sector schools.  On January 21, 2011, APSCU filed suit to challenge the Compensation Regulations, among others,[2] under the Administrative

---

[2] In 2009, the Department of Education also promulgated standards for state authorizations of postsecondary institutions (State Authorization Regulations) and created additional enforcement options to remedy misrepresentations made by postsecondary institutions (Misrepresentation Regulations).  APSCU challenged specific provisions of these regulations in prior litigation.  The State Authorization Regulations and Misrepresentation Regulations are not at issue here.

Procedure Act (APA), 5 U.S.C. § 706, and the U.S. Constitution.  This Court granted summary judgment to the Department on APSCU's claims concerning the Compensation Regulations.  *See Career Coll. Ass'n v. Duncan*, 796 F. Supp. 2d 108 (D.D.C. 2011).

On appeal, the D.C. Circuit affirmed in part and reversed in part.  With respect to the Compensation Regulations, the D.C. Circuit held that the Department's regulations provided a permissible interpretation of the HEA's prohibition on certain forms of incentive-based compensation.  However, the Circuit found two aspects of the Compensation Regulations arbitrary and capricious for want of reasoned decision-making.  First, the Circuit held that the prohibition on graduation-based compensation was arbitrary and capricious "without some better explanation from the Department."  *APSCU*, 681 F.3d at 448.  The Circuit explained:

> Congress created the Title IV programs to enable more students to attend and graduate from postsecondary institutions.  This specific safe harbor seems perfectly in keeping with that goal.  Indeed, the elimination of this safe harbor could even discourage recruiters from focusing on the most qualified students.
>
> The Department offered a brief explanation for its elimination of this safe harbor . . . . [T]he Department points to nothing in the record supporting these assertions.  It may well be that the Department actually eliminated this safe harbor based on the agency's belief that institutions have used graduation rates as a proxy for recruitment numbers.  But the Department never offered that explanation.

*Id.*

Further, the D.C. Circuit held that the Department had failed to respond to commenters' concerns that the Compensation Regulations could have an adverse effect on minority enrollment.  In particular, two commenters asked the Department to address whether the Compensation Regulations would apply to employees who were involved in recruiting minority students and, specifically, whether the Department intended to foreclose an institution's

ability to compensate staff for recruiting students from disadvantaged backgrounds.  The D.C. Circuit noted:

> [T]he Department stated that the Compensation Regulations apply to all employees at an institution who are engaged in any student recruitment or admission activity or in making decisions regarding the award of [T]itle IV, HEA program funds.  However, the Department never really answered the questions posed by [the commenters] because it failed to address the commenters' concerns . . . . [T]he agency's failure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense.

*Id.* at 449 (internal citations and quotation marks omitted).

The Circuit remanded these two portions of the Compensation Regulations to the District Court, with instructions to remand to the Department to (1) explain its elimination of the safe harbor for graduation-based compensation and (2) respond to commenters' concerns about the effects of the Compensation Regulations on diversity initiatives.  *Id.* at 448–49.  The Compensation Regulations were remanded to the Department of Education on August 14, 2012.

**C.  The Department's Actions on Remand**

On September 6, 2012, APSCU wrote a letter to Arne Duncan, Secretary of the Department of Education, to encourage the Department to engage in further notice and comment rulemaking to remedy the deficiencies identified by the Court of Appeals.  The Department did not respond to APSCU's request.  Instead, on March 22, 2013, the Department of Education issued an amended preamble to further explain the reasons for its Compensation Regulations and to address commenters' concerns about the enrollment of minority students.  *See* Program Integrity Issues, 78 Fed. Reg. 17,598, 17,599, 17,600 (2013) (codified at 34 C.F.R. § 668.14(b)(22)).

It is undisputed that the Department significantly expanded the number of reasons supporting its prohibition on graduation-based compensation.  However, the parties contest whether the quality and logical force of those reasons are sufficient to comply with the D.C. Circuit's directives.  With respect to the ban on graduation-based compensation, the Department explained:

> [I]t is the Department's experience that institutions use this safe harbor to provide recruiters with compensation that is indirectly based upon securing enrollments in violation of the HEA . . . . In other words, because a student cannot successfully complete an educational program without first enrolling in the program, the compensation for securing program completion requires the student's enrollment as a necessary preliminary step.

78 Fed. Reg. 17,599 (citation and internal quotation marks omitted).  In other words, because enrollment is a "first" and "necessary" precursor to graduation, *see id.*, the Department contends that the HEA's prohibition on enrollment-based compensation necessarily requires a total ban on graduation-based compensation.

The Department also referenced comments which had expressed concern that "[t]he shorter the program, the more likely the student will complete the program, thus rewarding enrollment and completion notwithstanding the student's academic performance or the quality of the program." *Id.*  Moreover, the Department mentioned its belief that graduation-based compensation could incentivize recruiters to steer students to the shortest possible programs, or contribute to "lowered admissions standards, misrepresented program offerings, lowered academic progress standards, altered attendance records, and a lack of meaningful emphasis on academic performance and program quality." *Id.*

In addressing concerns that the new regulations would curtail diversity initiatives, the Department stated:

> [T]he HEA prohibits all direct or indirect payments of incentive
> compensation to personnel or staff engaged in student recruitment
> and does not distinguish between incentives for personnel or staff
> recruitment actions that could have certain effects, *e.g.*, recruitment
> of a well-qualified or diverse student body.  The prohibition thus
> includes a prohibition on paying incentive compensation for efforts
> to promote diversity at an institution.
>
> . . . .
>
> The incentive compensation ban is designed, among other things,
> to keep students of all races and backgrounds from being urged or
> cajoled into enrolling in a program that will not best meet their
> needs.  Minority and low income students are often the targeted
> audience of recruitment abuses, and our regulatory changes are
> intended to end that abuse.

78 Fed. Reg. 17,600.

### D.  Procedural History

APSCU filed the instant Complaint on February 21, 2014, alleging that the

Department had failed to respond adequately to the D.C. Circuit's directives.  *See* Compl.

[Dkt. 1] ¶ 37 ("At a minimum, the remand required the Department to supply a reasoned

justification, supported by citations to the administrative record, for prohibiting graduation-based

compensation and to respond to commenters' concerns regarding the Compensation regulations'

effect on schools' ability to assemble a diverse student body.").

The parties filed cross-motions for summary judgment on March 4, 2014.[3]

APSCU argues that the Amended Preamble offers nothing more than recycled explanations,

additional verbiage, and unsupported speculation, and therefore fails to satisfy the D.C. Circuit's

---

[3] APSCU's Motion for Summary Judgment was originally filed as a "Motion for Further Relief"
in the prior case number.  *See* Mot. for Further Relief, *Career Coll. Ass'n v. Duncan, et al.*, Civ.
No. 11-138 (RMC) (D.D.C., Jan. 21, 2011), ECF No. 37.  Because the motion challenged agency
action on remand, *i.e.*, new agency action, at the parties' agreement, APSCU filed a new
Complaint.  Pursuant to the parties' stipulation regarding case management, the cross-motions
for summary judgment were transferred to this case number on March 4, 2014.

instructions on remand.  The Department responds that its additional statements and references to comments in the administrative record satisfy the minimal burden imposed by the remand.

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.*  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted).

B.  **Administrative Procedure Act**

APSCU challenges the proposed Compensation Regulations, alleging that the Department's revised regulations are arbitrary and capricious for lack of adequate explanation. The APA provides that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

In determining whether an agency's action was arbitrary and capricious, a reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."  *Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993).  An agency action usually is arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Id.*  Moreover, when an agency has acted in an area in which it has "special expertise," courts should be particularly deferential to the agency's determination.  *Sara Lee Corp. v. Am.*

*Bakers Ass'n Ret. Plan*, 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988)).[4]

## III.  ANALYSIS

APSCU contends that the Amended Preamble "largely parroted rationales already considered and rejected by the D.C. Circuit, garnished (at times) by additional rhetorical flourishes, unsupported assertions, and isolated anecdotes."  APSCU Mot. for Summ. J. [Dkt. 14] at 2.  The Department counters that it "more than satisfied its obligations on remand," particularly considering the deferential standard of review explicated by the D.C. Circuit.  Def. Mot. for Summ. J. [Dkt. 18-1] at 2.  APSCU correctly asserts that the Department has failed to explain and substantiate its wholesale ban on graduation-based compensation.  In addition, the Department has not furnished an adequate response to commenters' concerns about the impact of its regulations on minority recruitment.  Therefore, the Court will grant APSCU's Motion for Summary Judgment and deny the Department's Motion for Summary Judgment.

### A.  Graduation-Based Compensation

First, APSCU argues that the Department has restated the same unsubstantiated beliefs and anecdotes that the D.C. Circuit found insufficient as a matter of law.  Second, APSCU contends that the Department's new explanations must be rejected because they are "derivative of previously rejected rationales," "the Department does not substantiate its 'new' rationales with citations to evidence in the record," and "the 'new' justifications are unreasoned and lack any discernible connection to the HEA's goal of preventing the recruitment and enrollment of unqualified students."  APSCU Mot. for Summ. J. at 14.  For its part, the

---

[4] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue is proper in this district because the Department of Education is located in Washington, D.C., and a substantial part of the events or omissions giving rise to APSCU's claims occurred in the District of Columbia.  *See* 28 U.S.C. § 1391(b)(1)–(2).

Department describes its task on remand as "a simple one," because the Circuit merely demanded a better explanation of its decision to eliminate the safe harbor based on graduation rates in the context of a "fundamentally deferential" standard of review.  *See* Def. Mot. for Summ. J. at 8 (citing *APSCU*, 681 F.3d at 441, 449).  The Department claims it has fully satisfied the Circuit's instructions and requests deference as to its reasons.  *Id.*

When it rejected the initial justifications for the graduation-based compensation ban, the D.C. Circuit noted the apparent inconsistency between Title IV's focus on "enabl[ing] more students to attend and graduate from postsecondary institutions," and the Department's regulatory prohibition on graduation-based compensation, which had "seem[ed] perfectly in keeping with that goal."  *APSCU*, 681 F.3d at 448.  Given that tension, the D.C. Circuit ordered the Department to provide "some better explanation" and to "point[] to [evidence] in the record supporting [its] assertions."  *Id.*  Put differently, the Circuit required the Department to provide a more forceful explanation to overcome the apparent inconsistency between Title IV's emphasis on graduation and the elimination of a safe harbor that seemed to incentivize program completion.

In the Amended Preamble, the Department summarizes its reasoning: "[B]ecause a student cannot successfully complete an educational program without first enrolling in the program, the compensation for securing program completion requires the student's enrollment as a necessary preliminary step."  78 Fed. Reg. 17,599.  Since enrollment is a necessary precursor to completion, the Department insists that the HEA's prohibition on enrollment-based compensation should encompass graduation-based compensation.  In briefing, the Department's lawyers contend for the first time that institutions have used graduation rates as a proxy for recruitment numbers.  *See* Def. Mot. for Summ. J. at 9 (citing *APSCU*, 681 F.3d at 448).

But this explanation falls short of satisfying the D.C. Circuit's order. The "proxy" argument is advanced by the Department's lawyers on summary judgment (in response to an invitation from the Circuit, *see APSCU*, 681 F.3d at 448), but is not reflected in the Amended Preamble. Moreover, if graduation rates could be used as a proxy for recruitment numbers, graduation rates would need to serve as a nearly identical substitute for enrollment figures. *See* Webster's Third New Int'l Dictionary Unabridged 1828 (2002) (defining a "proxy" as "something serving to replace another thing or substance"). Nothing in the administrative record suggests the Department performed such an analysis, even after remand. What the Department stated in the Amended Preamble is the common-sense and irrefutable proposition that "compensation for securing program completion requires the student's enrollment as a necessary preliminary step." 78 Fed. Reg. 17,599. It cannot be gainsaid that enrolling in a postsecondary program—of any kind—precedes completion; in other words, one cannot end what one has not begun.

If accepted, this rationale would allow the Department to ban *all* incentive-based compensation in higher education, as enrollment is always a necessary predicate to any assessment of program success or student achievement. Congress specified that postsecondary institutions are prohibited from providing commissions, bonuses, or other incentive payments based "directly or indirectly on *success in securing enrollments* . . . ." 20 U.S.C. § 1094(a)(20) (emphasis added). Had Congress intended to proscribe all incentive-based compensation, it would have expressly done so by enacting a general ban on incentive payments, not limited to enrollments. *See Heckler v. Chaney*, 470 U.S. 821, 829 (1985) (noting "the common-sense principle of statutory construction that sections of a statute generally should be read 'to give effect, if possible, to every clause'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39

(1955))).  The fact that Congress chose to ban only enrollment-based incentives indicates that any regulatory prohibitions must be reasonably tied to *enrollment*, without permeating the entire postsecondary education process.

The Department's reference to short-term programs only highlights the analytical deficiencies in its Amended Preamble.  The Department does not point to evidence substantiating the prevalence of short-term programs as replacements for full-length education.  It does state that "[c]oncern over recruiters guiding students to short-term programs was not as prominent when the safe harbor was adopted in 2002 because the number of such programs was not as widespread then, having grown dramatically in more recent years."  78 Fed. Reg. 17,599. Assuming this statement is based on the Department's expertise and entitled to deference, it fails to explain why the growth of short-term programs justifies a *complete* ban on graduation-based compensation for programs of all lengths.  If the Department has evidence of particular abuses with short-term programs, it could readily address those concerns by linking graduation-based compensation to program length.  But it cannot offer those concerns as a basis for eliminating all graduation-based compensation.  As the D.C. Circuit pointed out, the goal of the HEA is successful graduation.  *See APSCU*, 681 F.3d at 448 ("Congress created the Title IV programs to enable more students to attend and graduate from postsecondary institutions.").

The Department also posits that graduation-based compensation would incentivize recruiters to "steer students to the shortest possible programs regardless of whether the programs are appropriate for the students, or to an even smaller number of program options where the recruiter believes completion is most likely to be obtained."  78 Fed. Reg. 17,599.  But again, the Department does not identify factual grounds in the record for its concerns.  The Court of Appeals ordered the Department to provide record citations for such assertions.  *See APSCU*,

681 F.3d at 448 (remanding to the agency because "the Department points to nothing in the record supporting [its] assertions").  In large measure, the Department has failed to do so.

The Department also cites the potential for institutional abuse without a total ban on graduation-based compensation.  The Department believes that "retaining [the] safe harbor could contribute to lowered admissions standards, misrepresented program offerings, lowered academic progress standards, altered attendance records, and a lack of meaningful emphasis on academic performance and program quality."  78 Fed. Reg. 17,599.  The Department also believes that "if the safe harbor were retained . . . [recruiters] would likely need to enroll even more marginal students, and make even greater unfounded claims about a program . . . ."  *Id.* However, other provisions of the HEA expressly proscribe misrepresentations in the for-profit college industry.  *See* 20 U.S.C. § 1094(c)(3)(A) ("Upon determination . . . that an eligible institution has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates, the Secretary may suspend or terminate the eligibility status for any or all programs  . . . .").  The Department's task on remand was to support its contention that graduation-based compensation was tantamount to enrollment-based compensation.  Thus, any reference to concerns addressed in other statutory provisions is inapposite.

Finally, the Department offers an example in which a postsecondary institution "counted a student who studied culinary arts and was working in an entry-level position in the fast food industry as being employed in his field of study."  78 Fed. Reg. 17,599.  This lone example was included in the initial preamble, causing the D.C. Circuit to remark that "isolated examples of students who graduated from schools but could not find commensurate work . . . [were] insufficient."  *APSCU*, 681 F.3d at 448.  So, too, here.

The Court appreciates the deference due to the Department, but the D.C. Circuit instructed the Department to provide record evidence in support of its graduation-based compensation ban.  Because the Department has failed to do so, the Court will remand this aspect of the Compensation Regulations.  *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, [that factor] counsels remand without vacatur." (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

**B.  Response to Diversity Concerns**

The D.C. Circuit also ordered the Department to address concerns expressed during the initial rulemaking concerning the impact of the Compensation Regulations on institutional efforts to assemble a diverse student body.  APSCU challenges the sufficiency of the Department's responses on remand, arguing that it has merely repeated rationales that the D.C. Circuit already has rejected.  The Court agrees.

The Circuit noted that "an agency's obligation to address specific comments is not demanding," and concluded that the Department's initial rulemaking "fell just short."  *APSCU*, 681 F.3d at 449.  The Court of Appeals remanded the Compensation Regulations to cure the agency's complete failure to address two commenters' concerns about the impact of the ban on recruitment incentives for minority enrollment.  Noting that it should be "a simple matter" to address these concerns on remand, *id.*, the Circuit specifically ordered the Department to respond to the comments that the Compensation Regulations "could have an adverse *effect* on minority enrollment," *id.* at 448 (emphasis added).

The Amended Preamble fails to do so.  On remand, the Department clarified that "[t]he prohibition [on enrollment-based compensation] . . . includes a prohibition on paying

incentive compensation for efforts to promote diversity at an institution." 78 Fed. Reg. at 17,600. However, the Department did not address comments that the enrollment-based compensation ban "could have an adverse *effect* on minority enrollment." *See APSCU*, 681 F.3d at 448 (emphasis added). The Amended Preamble merely demonstrates that the Department has statutory authority to proscribe enrollment-based compensation. The Department included the same reference in its first preamble, which the D.C. Circuit rejected as nonresponsive on appeal. *See APSCU*, 681 F.3d at 449. The Department's reliance on the same assertion is similarly nonresponsive here.

In addition, the Amended Preamble states that the ban on enrollment-based compensation is "designed . . . to keep students of all races and backgrounds from being urged or cajoled into enrolling in a program that will not best meet their needs. Minority and low income students are often the targeted audience of recruitment abuses, and [the] regulatory changes are intended to end that abuse." 78 Fed. Reg. 17,600. The agency was directed on remand to address whether "the new regulations might adversely affect diversity outreach," *APSCU*, 681 F.3d at 449, and the Amended Preamble continues to avoid that question. The Circuit specifically ordered the Department to address the potential effect on minority recruitment, *i.e.*, whether minority enrollment could decline under the new regulations. *See id.* (remanding, in part, because "the Department never really answered the questions posed by" two institutional commenters). Because the Department has yet to answer that question, the Compensation Regulations will be remanded again.

## IV.  CONCLUSION

The D.C. Circuit remanded the Compensation Regulations, with the expectation that it would be "a simple matter" for the Department to address the deficiencies in its initial

rulemaking.  *APSCU*, 681 F.3d at 449.  On remand, the agency has failed to explain its ban on graduation-based compensation or respond to commenters' concerns about the impact of the enrollment-based compensation ban on minority recruitment.  APSCU's Motion for Summary Judgment will be granted and the Department's Motion for Summary Judgment will be denied. The Compensation Regulations will be remanded to the Department of Education for further proceedings consistent with this Opinion.


Date: October 2, 2014                         _____/s/_____
                                              ROSEMARY M. COLLYER
                                              United States District Judge